Linnie NIXON, III, a/k/a Linny Nixon, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–94–303CR.

Court of Appeals of Texas, Beaumont.

Submitted March 22, 1996.

Decided July 10, 1996.

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Criminal Dist. Atty., Rodney D. Conerly, Asst. Criminal Dist. Atty., Beaumont, for State.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

The record before us reflects appellant waived a jury and pleaded not guilty to the felony offense of Possession of a Controlled Substance (Cocaine). A written stipulation of evidence was introduced by the State which included a copy of the probable cause affidavit for appellant's arrest warrant and a copy of the lab report indicating the contraband recovered from appellant's person was indeed cocaine. This written stipulation of evidence does not rise to the level of a judicial confession nor, apparently, was it intended to as evidenced by appellant's plea of not guilty. *See Dinnery v. State,* 592 S.W.2d 343, 351–352 (Tex.Crim.App.1979)(opinion on rehearing). The trial court found appellant guilty and assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of ten (10) years. A fine of $1,000 was also assessed. Incarceration of appellant was suspended and appellant was placed on probation for a period of ten years.[1]

Prior to the plea proceeding, the trial court conducted a hearing to entertain appellant's pretrial motion to suppress.[2] Testimony was elicited from two police officers and the appellant himself. It appears from said testimony that while in the back yard of a private residence, appellant was arrested for the misdemeanor offense of Disorderly Conduct (language). TEX. PENAL CODE ANN. § 42.01(a)(1) (Vernon 1994). A search of appellant's person incident to his arrest turned up a rock-like substance which later tested positive for cocaine. The lone point of error on appeal complains the trial court erred in failing to suppress the cocaine because the place appellant was arrested was private property.

Section 42.01(a)(1) reads as follows:

(a) A person commits an offense if he intentionally or knowingly:

(1) uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace; ...

TEX. PENAL CODE ANN. § 1.07(a)(40) (Vernon 1994) defines "public place" as:

---

1. Appellant also pleaded not guilty to a separate and entirely unrelated felony charge of Possession of Controlled Substance (Cocaine) at the same plea proceeding, and was assessed an identical probationary sentence. We have disposed of the appeal in that case in a separate opinion. *See Nixon v. State,* 928 S.W.2d 212 (Tex.App.— Beaumont 1996, n.p.h.).

2. Contrary to contentions in the State's brief, appellant did receive a ruling from the trial court that his motions to suppress were denied. This is noted on the docket sheet in cause number 59788, and is reflected in the statement of facts from the plea proceeding.

[A]ny place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony. *Banda v. State,* 890 S.W.2d 42, 51 (Tex.Crim. App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995). The reviewing court does not engage in its own factual review, and so long as the record supports the trial court's findings, the reviewing court is not a liberty to disturb them. *Id.* at 51–52. On appellate review, the court considers only the question of whether the trial court improperly applied the law to the facts. *Id.* at 52. The Court of Criminal Appeals has recently discussed the scope of appellate review with regard to evidentiary suppression rulings by trial courts in *DuBose v. State,* 915 S.W.2d 493, 497–498 (Tex.Crim. App.1996):

> When the courts of appeals analyze a trial court's denial of a motion to suppress evidence they must be deferential to the trial court's judgment, not only as to the historical facts, but also as to the legal conclusions to be drawn from the historical facts—at least so long as it appears the trial court has applied the correct standard of law to those historical facts. They should reverse the trial court's decision only for an abuse of discretion; that is to say, only when it appears that the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion.

As a general rule, police officers must obtain an arrest warrant before taking someone into custody. *Dejarnette v. State,* 732 S.W.2d 346, 349 (Tex.Crim.App.1987). Exceptions to the warrant requirement are strictly construed. *Id.* One exception is "[a] peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view." TEX.CODE CRIM. PROC. ANN. art. 14.01(b) (Vernon 1977). This statutory provision requires the legal equivalent of probable cause to believe that a particular person has committed an offense. *Amores v. State,* 816 S.W.2d 407, 413 (Tex. Crim.App.1991). The State has the burden to prove probable cause existed when the officer made the arrest. *Roberts v. State,* 545 S.W.2d 157, 158 (Tex.Crim.App.1977).

In the instant case, the testimony of the arresting officer, Don Gordon, indicated he first encountered appellant in the back yard of a private residence. Officer Gordon had followed appellant's brother into the back yard after having observed appellant's brother trespassing at a nearby location. While speaking to appellant's brother, Officer Gordon observed appellant approach him. Officer Gordon further testified as follows:

Q. [The State] And at that point did you, in fact, have an occasion to talk with the Defendant, Linnie Nixon?

A. [Gordon] Yes, ma'am, I did.

Q. Can you tell the Court how that occurred.

A. As we were trying to settle John down—John is Linnie's brother—we were trying to settle him down to keep from taking him to jail or causing a scene. And that is when Linnie Nixon got involved. He started yelling and screaming and making statements to the effect that—

Do you want me to state it exactly?

Q. Go ahead.

A. He made the statement like, "All you guys is fuck with blacks. You—I don't care about going to jail. I have a lawyer. If you mess with me, I will have a case against you." Things of that nature. He became real combative and very upset.

Q. Officer, were there any other people around at this time?

A. Yes, ma'am. There was a large group of people there at the scene at 4010 Magnolia. And also people started to come from the apartment complex and started gathering to see what was all of the argument and yelling and profane language was about.

Q. And, Officer, at this time, did you feel that the situation was getting out of hand?

A. Yes, ma'am, it was getting out of hand.

Q. What did you do at that point?

A. At this time I focused my attention on Linnie, because he was too violent, and it didn't concern him.

. . .

[Officer Gordon then identifies appellant for the record]

Q. Officer Gordon, what did you do at this point?

A. At this time I focused all of my attention on Linnie. And I called for a back-up unit to come and assist us because it was getting out of hand, and there were too many people gathering around. And for that area, there was a very high—

. . .

[Appellant's objection overruled.]

Q. And did you feel at this point that an offense had been committed by the Defendant?

A. Yes, ma'am, I did.

Q. And what offense did you feel had been committed by the Defendant?

A. Disorderly conduct and language.

Q. And explain to the Court in what way you felt this had occurred.

A. It was a breach of the peace. He was causing a disturbance and causing people to come and see what was going on. His voice was carrying, where the whole neighborhood could hear what was going on and the language that he was using.

Q. Involving the curse words?

A. Yes, ma'am.

Q. Was this directed at yourself and Officer Williams?

A. Yes, ma'am, it was.

Q. Did you place him under arrest at this point?

A. Yes, ma'am. I advised him that he was under arrest and also told him the charge, DOC Language.

Q. Did you handcuff him at this point?

A. Yes, ma'am.

THE COURT: What was the "DOC"? (sic)

THE WITNESS: Disorderly conduct language.

On cross-examination, Officer Gordon further testified as follows:

Q. [Trial Counsel] And, likewise, 4010 Magnolia—you have already told us—is a residence; so, it would not be a shop. There is not business conducted there, is there?

A. [Gordon] No, ma'am, there is not.

Q. And 4010 Magnolia is not an area that is—to which the public—the general public is invited. Isn't that likewise correct?

A. She keeps a lot of people there. I don't know.

Q. But whether she has a lot of friends or not is not my question. My question is it is not an area that is open to the general public, is it? It is her home.

A. Well, see, it is hard to explain that, because there is a lot of company there in the area, including: Gang members and et cetera—

On redirect examination, the State elicited further testimony from Officer Gordon as follows:

Q. [The State] And were you close to the street; is that correct? Or were you on the street?

A. [Gordon] I was on the backyard of 4010 Magnolia.

Q. And he came within a foot of you?

A. Yes ma'am.

Q. In the backyard?

A. Yes ma'am.

Q. And how many people could you approximate had gathered around when he started cursing at you?

A. About 50.

Q. About 50 people?

A. And people were still coming to the area.

Q. Did he use abusive language, Officer Gordon?

A. Yes, ma'am, he did.

Q. Did you feel by the language that he was using that an immediate breach of the peace could be occurring?

A. Yes, ma'am, it was.

Q. You also testified, after repeated questioning, that it is hard to describe the

residence at 4010 Magnolia because a lot of people gather—a lot of people gather in the yard—

[Appellant's objection overruled.]

A. 4010 Magnolia is an area to which a large group of gang five—nine—hoover crooks congregates. Also, you have a number of winos. And they all congregate at this location. For what reason, I don't know.

It is also an area in which a lot of drug dealing occurs. And, at any given time, you might have 10 to 15 to 20 people in that general area. And this is like 24 hours a day, seven days a week.

Q. Are they on the yard, or are they on the porch? Where are they, Officer Gordon?

A. In the yard—the backyard of 4010 and plus the adjacent property behind 4010 Magnolia.

In the relatively recent case of *Banda v. State*, the Court of Criminal Appeals reaffirmed its holding in *Clinton v. State*, 64 Tex.Crim. 446, 142 S.W. 591 (1912), that a place may or may not be a public one according to the facts and circumstances. *Banda*, 890 S.W.2d at 52. We recognize the concurring opinion in *Banda* by Judge Baird reaches the opposite conclusion as he relies on language taken from *Pugh v. State*, 55 Tex.Crim. 462, 117 S.W. 817, 818 (1909). Under the standards of appellate review previously discussed, we cannot say the trial court applied an erroneous legal standard to the testimony elicited from Officer Gordon regarding the "social" circumstances of 4010 Magnolia. Under said circumstances, it was not error for the trial court to conclude 4010 Magnolia was indeed a "public place." Appellant's motion to suppress was properly denied. We overrule appellant's point of error. The judgment and sentence of the trial court are affirmed.

AFFIRMED.